# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | | |
|---|---|---|---|
| NEAL SANTANGELO, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | No. 14 C 7723 | |
| v. | ) | | |
| | ) | Judge Sara L. Ellis | |
| CROWN CORK & SEAL USA, INC., and | ) | | |
| KEN TUTIN, | ) | | |
| | ) | | |
| Defendants. | ) | | |

## OPINION AND ORDER

Plaintiff Neal Santangelo alleges that his employer, Defendant Crown Cork & Seal USA, Inc. ("Crown Cork"), and his supervisor, Defendant Ken Tutin, fired him because he was 60 years old. Santangelo claims that Crown Cork violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Illinois Human Rights Act ("IHRA"), 77 Ill. Comp. Stat. 5/1-101 *et seq.* and that Tutin is liable for tortious interference with business relations. Crown Cork and Tutin move for summary judgment [58]. Because Santangelo fails to show all of Crown Cork's reasons for firing him are pretextual and because Santangelo does not present evidence that could convince a reasonable jury that Crown Cork fired him for a discriminatory purpose or that Tutin was motivated by age-based animus, the Court grants Defendants' motion for summary judgment on Santangelo's employment discrimination claims and his tortious interference claim.

# BACKGROUND[1]

From August 11, 2003 through March 4, 2013, Santangelo was the plant manager at Crown Cork's Alsip, Illinois packaging plant ("Alsip"). Plant manager was the highest ranking managerial employee; Santangelo ran plant operations and oversaw production quality, accounting, and maintenance.

Beginning in 2007, Tutin supervised Crown Cork's six Aerosol Division plants, including Alsip. As supervisor, Tutin evaluated Santangelo's and other plant managers' work performance. Tutin, a former plant manager himself, believed that plant managers hold significant responsibility, and Tutin and Crown Cork expected plant managers to do the job they were asked to do.

Tutin wrote annual reviews of Santangelo's performance (called an "Employee Performance Roadmap").[2] Reviewing Santangelo's performance in 2007, Tutin noted that Santangelo had a "challenging year in the Alsip plant" and that Alsip "missed an opportunity to post an outstanding result in 2007 due to a lack of attention to detail." Doc. 59 ¶ 8. Tutin also expressed confidence that Santangelo would recover and lead sustained performance in 2008 with "his leadership and interpersonal skills and [by] becoming more personally involved with auditing and follow-up in key areas of control." *Id.*

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts and additional facts preferred by Santangelo in his opposition to summary judgment. The Court has considered the parties' objections to the statements of fact and supporting exhibits and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. All facts are taken in the light most favorable to Santangelo, the non-movant.

[2] Tutin evaluated Santangelo on (1) Key Performance Indicators ("KPIs," which benchmark the core competencies and attributes required for success in the organization), (2) Results Achieved, (3) Path Forward, and (4) Overall. *Eg.*, Doc. 59-13 at 3 (Dep. Ex. 5). Tutin rated Santangelo on criteria within each section on a 1–5 low-to-high scale. *Id.* at 2. Santangelo points out that "3" meant "Acceptable," meaning the work in the area met job requirements and performance was consistent and of acceptable quality and "4" meant "Very Good," meaning the employee performance met and often exceeded his job requirements. *See, e.g., id.*

Reviewing Santangelo's 2009 performance, Tutin noted that Santangelo needed to continue to show progress in managing a paradigm change at Alsip and that Santangelo excelled at collecting data and identifying problems but often failed to disclose issues or give assignments to employees. Tutin also wrote that Santangelo struggled to adapt even though he was expected to recognize problems and react more quickly moving forward and that Tutin expected Santangelo to transform Alsip into a more robust and flexible group capable of addressing industry challenges.

For Santangelo's performance review in 2010, Tutin wrote that 2010 was a "year of transformation" and implied that Alsip had changed from a plant where there were complaints and excuses for poor performance into a "go to style plant." *Id.* ¶ 14. In 2010 and before, Santangelo had requested additional work for Alsip to ensure it was operating at maximum capacity and to increase the plant's efficiency variances. Tutin wrote in the review that Santangelo and Alsip showed they were capable and produced "very positive results." *Id.* ¶ 96. Alsip's efficiencies improvement and Santangelo's improvement with communications and follow-up with his employees impressed Tutin. He also noted that Alsip led in "spoilage reduction, weld leaker reduction, and HFI management metrics."[3] *Id.* Tutin exclaimed for Santangelo: "Nicely done!" *Id.* Santangelo received a 3.52 KPI rating and achieved a 101.1% results score.

For 2011, Tutin wrote that Santangelo had a solid performance, noted that a corporate-level issue negatively impacted Alsip's overall financial performance, and stated that plant investments had positioned Santangelo and his team for more improvement. Tutin also wrote that "Alsip required little to no division level management intervention . . . due to the

---

[3] "HFI" means held or hold for inspection and refers to a batch of product not shipped because the batch contains some amount of defective product.

consistency of performance in operation." *Id.* ¶ 97. Tutin praised the "[s]trong year!" *Id.* Santangelo received a 3.6 KPI rating and a 99.2% results score. In his written response to his review, Santangelo wrote that he agreed and accepted that Alsip's "quality output must improve in Assembly by eliminating the waste is [sic] spoilage and generation of HFIs." *Id.* ¶ 18. Overall, though, in 2011, Alsip had the second lowest percentage of defects held for inspection (0.47%), with 796,692 cans held for inspection out of the 168,175,842 cans Alsip produced. The lowest percentage was 0.40%. The highest was 0.77%.

In 2012, there was a HFI incident at Alsip. Alsip could not ship a batch of cans because some cans were defective. Santangelo used temporary workers to sort the defective cans, reasoning that the temporary labor was cheaper than paying overtime to the employees who made the product, and he avoided asking the regular employees to admit they had produced defective cans. But Tutin emailed Santangelo, explaining that he wanted the employees who created the defective cans to find them. Tutin's underlying message was that he did not want HFIs and that he believed Santangelo was not doing enough in the leadership department to prevent the HFIs in the first place. Santangelo followed Tutin's orders to change who was sorting the cans. Eventually, Tutin came around on the use of temporary workers to sort defective products and began encouraging such work in 2013.

Tutin, who had heard concerns about leadership and management at Alsip, decided to conduct a meeting at Alsip with all employees (an "all-shift" meeting). He brought Katherine McGovern, the Aerosol Division's newly hired HR Manager, with him to Alsip.[4] McGovern had also received feedback about the management and leadership style at Alsip, which she believed was not healthy and the responsibility of the plant manager, Santangelo.

---

[4] McGovern had received complaints from other plants in Decatur and Aurora, but none were about plant managers and McGovern was not aware of complaints about other plant managers.

Tutin and McGovern interviewed Alsip employees on June 28, 2012. McGovern interviewed all the hourly employees but only some upper-level managers who reported to Santangelo. Tutin and McGovern heard complaints about the plant's management, which McGovern believed revolved around Santangelo and the plant superintendent, Rich Rayhill. Tutin told Santangelo that he needed a plan to address the problems or his job was in jeopardy.

Tutin placed Santangelo on a Performance Improvement Plan ("PIP") on July 2, 2012. Tutin and McGovern prepared a memorandum, summarizing the all-shift meeting and themes they thought were problems. The memo identified problems involving poor communication, employee fears of seeking assistance, favoritism, and lack of development training, respect, action plans, and maintenance of key parts. Tutin wrote that he had targeted many of these problems for Santangelo before but had not seen improvement. Tutin ended the memo by stating that if he did not see improvement "on a consistent and sustained basis," then he would change Alsip's leadership, and Santangelo would receive discipline and might be fired. Doc. 59-16 at 32 (Dep. Ex. 105). Santangelo knew that the July 2, 2012 memo was a PIP and that he needed to remedy the issues or face discipline.

Santangelo created a plan to address the PIP's critiques. He emailed the plan to Tutin and then interviewed Alsip's employees. Santangelo learned that Rayhill was the source of many leadership issues. Santangelo believed Rayhill was preventing employees from trusting and respecting Santangelo because the employees believed Rayhill lied to the employees and did not listen to their problems. Santangelo continued to provide monthly reports (he called them "change plan updates," *see* Docs. 62-7–62-10) to Tutin in August, September, October, and November of 2012.

On July 16, 2012, in an attempt to improve relations at Alsip, Santangelo sent a memo to all Alsip supervisors about the employee issues raised at the all-shift meeting. Santangelo's memo mentioned the same issues as his PIP. Alsip's HR manager, Camille Speeks, bristled at the memo and contacted McGovern.[5] McGovern told Santangelo to retract his memo, believing he was shirking responsibility by placing the problems identified in his PIP onto the shoulders of his supervisors. She wanted Santangelo to talk to plant supervisors on a one-on-one basis. Santangelo retracted the memo, but he did not conduct the one-on-one meetings.

In August 2012, Alsip had another quality issue. A customer received cans of suspect quality, and Crown Cork agreed to pay for any problems that the cans created. Tutin emailed Santangelo and Rayhill, believing that their poor judgment was to blame. Tutin told Santangelo and Rayhill that they had given Alsip employees the impression that management condoned employees approving defective cans in order to increase production and reach quotas. Tutin thought this exemplified Alsip's problems with communication and quality and its issues with leadership and management. Tutin implored Santangelo to root out the cause of Alsip's quality problem. Santangelo investigated and learned that plant supervisors at Alsip failed to follow standard operating procedures. From then on, Crown Cork's Director of Quality, Doug McFadden, would approve shipping defects, not Alsip management.

In September 2012, Tutin emailed Santangelo a memo discussing Santangelo's change plan update. Tutin reiterated that he wanted Santangelo to improve his leadership and again warned Santangelo he could be dismissed if he did not improve. Later in the month, Tutin spoke with Santangelo again. Tutin thought Alsip was not meeting its financial goals, an observation

---

[5] Santangelo wanted to put Speeks on a PIP in 2012, but McGovern would not let him. Santangelo thought Speeks was understaffing Alsip, which led Tutin to blame Santangelo for vacancies. After Santangelo was fired, the new plant manager placed Speeks on a PIP, and Speeks left Crown Cork in the summer of 2013.

he expressed on September 24, 2012. Then on September 26, 2012, Tutin received a new supplier complaint about quality and exclaimed his frustration to Santangelo about "one-off-HFIs" at Alsip. Doc. 59-14 at 27 (Dep. Ex. 49).[6] Then on September 28, 2012, Tutin congratulated Santangelo for the Alsip plant's performance on the prior day, September 27.

On December 7, 2012, Santangelo received Tutin's written responses to Santangelo's November change plan update. Santangelo understood Tutin's response to mean that Santangelo had accomplished his goal to change and improve his performance. But Tutin meant a different message. He wanted to give Santangelo the positive feedback he deserved but also give "very candid feedback in areas where performance was continuing to be lacking." Doc. 59-2 at 255:10–11 (Tutin Dep. Tr.); Doc. 59 ¶ 54. Tutin praised Santangelo's leadership advances but also told Santangelo to continue the trend because Tutin was still watching Alsip.

Days later, McGovern returned to Alsip for more all-shift meetings on December 11 and 12, 2012. McGovern told Santangelo that she received positive feedback about the work environment. She heard that the supervisor and superintendent were positively addressing problems and getting things done. McGovern also received negative feedback that she wanted to review with Tutin. She heard anecdotes criticizing Alsip's management. But since the first all-shift visit, McGovern had received complaints specifically about Santangelo from two employees.

Tutin wrote Santangelo's 2012 annual review, which Santangelo received and signed himself on February 1, 2013. Tutin gave Santangelo a "Needs Improvement" rating. Tutin

---

[6] The parties' Joint Statement of Undisputed Facts cites the wrong source for this undisputed fact, *see* Doc. 59 ¶ 49 (citing Santangelo Deposition Transcript for testimony), but, clearly, it is a scrivener's error. The five-sentence-long direct quote cited in the undisputed fact paragraph comes from an exhibit the parties attached.

wrote that Santangelo's work improved after Tutin intervened and imposed the PIP. He also

wrote that he wanted Santangelo to improve more in 2013 without Tutin's advice and counsel.

Overall, in 2012, Alsip had a lower percentage of can defects held for inspection than the

Faribault, Decatur, and Spartanburg plants. Alsip's efficiency variance also was better than

Spartanburg, Decatur, and Aurora.[7]

"Tutin provided [Santangelo] with feedback on his performance under the PIP via

telephone conversations, email, written memos, and face to face meetings when at the Alsip

plant." Doc. 59 ¶ 55. Tutin confirmed this to McGovern and Bolton in his communications to

them. McGovern had no documentation of any guidance she gave Santangelo during his PIP.

Tutin told McGovern he was having regular meetings, "very often," with Santangelo.

Santangelo denies Tutin met face-to-face with him until five months after the PIP when Tutin

gave Santangelo his annual performance review. While on his PIP, Santangelo provided his

monthly change plan update reports to Tutin on his own initiative. Tutin did not write responses

to Santangelo's monthly reports until November 2012.

Tutin presented Santangelo an award in early 2013 for the best quality work in the

division. Alsip made 180 million cans without a customer complaint or chargeback (a customer

request for credit for faulty work in received products). Tutin also praised Santangelo on

February 6, 2013 in a division-wide email praising the Alsip and Faribault plants as heavy lifters.

As of February 28, 2013, Alsip had the second best efficiency variance year-to-date, the best

spoilage numbers, and the best operating variance.

On February 14, 2013, Tutin wrote to Santangelo about two new quality problems at

Alsip, expressing disappointment. The next day, McFadden sent Tutin and McGovern a

memorandum on "quality issues and how it was mishandled by Alsip Plant Management." Doc.

_____

[7] The parties do not define "efficiency variance" in the Joint Statement of Undisputed Facts.

59-6 at 1 (Tutin Dec. Ex. 1).  At Alsip, 35,000 cans were held in January and 68,000 held in February "due to poor management controls and processes."  *Id.*  The February event occurred because a supervisor was not supervising a production line; he was working on another line instead.  Tutin learned that the supervisor had done this before and that Santangelo had known about the supervisor's behavior since 2007 but failed to make good on his promise to prevent a reoccurrence.

Tutin decided that Santangelo was not improving and that he had to fire Santangelo. Tutin thought that "things in early 2013 appeared to be unraveling again."  Doc. 59-2 at 408:9– 10 (Tutin Dep. Tr.).  Tutin testified that he made the decision because of Santangelo's "personal performance" and issues with "his leadership, his inability to lead, plan, organize and control activities in his plant."  *Id.* at 10:20–21, 11:15–17 (Tutin Dep. Tr.).  Tutin believed Santangelo could not lead because he "consistently struggled with [the] functional dynamic of his staff . . . was not an effective communicator with his people on the shop floor . . . [had] perennial issues with quality lapses of control in his plant . . . [and had] numerous people coming forward to express dissatisfaction with the working environment that Mr. Santangelo was creating."  *Id.* at 11:22–12:5.  Tutin also considered Alsip's performance problems including "the repetitive inability to control quality processes" and "[r]epetitive concerns with [Santangelo's] inability to take . . . masses of information . . . about . . . problems . . . in the plant relative to downtime or spoilage or quality . . . and be able to create and then implement action plans on his own through his team that actually could move performance forward in the organization."  *Id.* at 28: 14–21.

Tutin had other concerns about Santangelo's impact on Alsip as well.  Alsip's plant accountant, Dave Koch, told Tutin that Santangelo and Rayhill had shut Koch out of management activities.  Alsip's quality manager, Kevin O'Rourke, told Tutin that the

relationship between Santangelo, Rayhill, and O'Rourke stopped O'Rourke from achieving quality results. O'Rourke was afraid of Santangelo and feared retaliation if he complained. Also in February 2013, Santangelo had asked Tutin to take responsibilities away from Rayhill and reassign them. Tutin did not like the proposal and thought Santangelo was not taking ownership over Alsip's performance problems and instead was redistributing the same problems elsewhere.[8]

Andy Bolton, Crown Cork's Aerosol Division President, agreed with Tutin and approved the decision to fire Santangelo. Bolton agreed that Santangelo had problems with leadership, shop floor engagement, and teamwork and that it was in Crown Cork's best interests to move on from Santangelo. Santangelo received a March 4, 2013 letter informing him that his termination was effective that day. He was 60 years old at that time.

### Other Plant Managers

Before January 2009, Gregg Gann, who is approximately 50 years-old, managed Crown Cork's Spartanburg plant. Gann resigned, and Hank Mangum, who was in his 40s, replaced him. Brian McGrath, who is over 50, managed the Decatur plant. At some point, Tutin fired McGrath and hired Bret Shankelton, who was in his mid-to-late 30s at the time. Tutin fired Shankelton and hired Tim Carpenter, who was 42.

Shankelton started as Decatur plant manager in April 2008, and, in his first year he received a 3.28 overall KPI rating in his 2008 performance review. The next year, he received a 3.32. In his 2010 performance review, he received a 2.91. There, Tutin wrote that Shankelton "struggled to build a cohesive staff that was focused on consistency of execution" and had "staff dysfunctionality" that he "held a majority stake in" because he was plant manager. Doc. 59 ¶ 90.

---

[8] Tutin did not allow Santangelo to put Rayhill on a PIP or demote him. Rayhill was demoted after Tutin fired Santangelo.

Tutin prepared memos and emails about Shankelton's leadership and performance deficiencies, including his failure to control high HFIs. Tutin wrote a 10-page memorandum to Shankelton on March 1, 2010, laying out leadership and management problems and how Tutin expected Shankelton to fix them. Tutin then traveled to Decatur and worked with Shankelton for two days on plant issues. On May 19, 2011, Tutin wrote another memorandum that stated he was placing Shankelton on a PIP from May 19 to June 29, 2011. Tutin fired Shankelton in June 2011.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

Santangelo alleges that he performed well as Alsip's plant manager but Tutin and Crown Cork terminated him in spite of his positive performance because of his age. He claims that Crown Cork is liable for employment discrimination and that Tutin is personally liable for his intentional and discriminatory decision to fire Santangelo. The Court addresses Santangelo's claims in turn.

## I.     Age Discrimination Claims Against Crown Cork

The ADEA prohibits employers from discharging employees because they are 40 years-old or older. 29 U.S.C. §§ 623(a)(1), 631(a). The IHRA prohibits unlawful discrimination against a person on the basis of his age in the employment context. 775 Ill. Comp. Stat. 5/1-102, 1-102A. The federal and state statutes target the same discriminatory employment practices, and the Court's analysis is the same for both claims. *Wyman v. Evgeros, Inc.*, No. 15 C 2758, 2017 WL 386651, at *2 (N.D. Ill. Jan. 27, 2017).

At summary judgment, "[Santangelo] must produce evidence from which a jury could infer that [his] age 'was a but-for cause of [his] termination.'" *Ripberger v. Corizon, Inc.*, 773 F. 3d 871, 880 (7th Cir. 2014) (quoting *Fleishman v. Cont'l Cas. Co.*, 698 F. 3d 598, 604 (7th Cir. 2012), and citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)). The Court must determine "whether a reasonable factfinder could 'conclude that [Santangelo's] proscribed factor caused the discharge.'" *Brown v. DS Servs. of Am., Inc.*, --- F. Supp. 3d ----, 2017 WL 1178229, at *5–6 (N.D. Ill. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

To demonstrate that he has the evidence needed to survive summary judgment, Santangelo focuses on the burden-shifting test laid out in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), which allows a plaintiff to establish a *prima facie* case of discrimination and then rebut a defendant's stated non-discriminatory reason for the termination. *David v. Bd. of Trs. of Cmty. College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Santangelo must show a *prima facie* case exists by presenting facts that "(1) [he] is a member of a protected class, (2) [he] performed reasonably on the job in accord with [his] employer's legitimate expectations, (3) despite [his] reasonable performance, [he] was subjected to an adverse employment action," *id.* (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)), and (4) Crown Cork treated similarly situated, younger employees (under 40 or substantially younger) more favorably, *Martino v. MCI Comm'ns Servs., Inc.*, 574 F.3d 447, 453–54 (7th Cir. 2009). If Santangelo does this, then Crown Cork "must articulate a legitimate, nondiscriminatory reason" for firing Santangelo, "at which point the burden shifts back" to Santangelo to submit evidence showing Crown Cork's reason is pretextual. *Brown*, 2017 WL 1178229, at *6 (quoting *Andrews*, 743 F.3d at 234). The parties agree that Santangelo is part of the class protected by the ADEA and that his termination amounted to an adverse employment action, so Santangelo's *prima facie* case turns on whether he was meeting Crown Cork's legitimate expectations and whether he was treated less favorably than a similarly situated, younger employee.

Things are not so simple here though because Santangelo claims that Crown Cork, and Tutin especially, did not fairly apply its legitimate expectations to him. The *McDonnell Douglas* test, with its rigid numbers and multi-factor steps, actually "is flexible." *Ismail v. Brennan*, 654 F. App'x 240, 243 (7th Cir. 2016). All the *prima facie* factors "may be unnecessary," *id.*, when "the people judging [Santangelo's] performance were the same [he] accused of discriminating against [him]," *id.* (quoting *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 n.3 (7th Cir. 2001)).

That is, "[e]ven if an employee was not meeting his employer's legitimate expectations, he can still establish a *prima facie* case . . . if the company applied its expectations against him in a discriminatory manner." *Dossiea v. Bd. of Educ. of City of Chicago*, No. 07 C 1124, 2008 WL 4133418, at *4 (N.D. Ill. Aug. 22, 2008) (citing *Peele v. County Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)); *Wyman*, 2017 WL 386651, at *3 (citing *Senske v. Sybase*, 588 F.3d 501, 506–07 (7th Cir. 2009)). For example, "[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner (i.e., applied expectations to similarly situated . . . younger employees in a more favorable manner), the second and fourth prongs of *McDonnell Douglas* merge." *Peele*, 288 F.3d at 329. And when the employee argues that the employer is "lying about its legitimate employment expectations in order to set up a false rationale for terminating him . . . the question of whether he was meeting [the employer's] legitimate expectations merges with the question of whether [the employer's] reasons for firing [the employee] are pretextual." *Senkse*, 588 F.3d at 507. Thus, Santangelo's case boils down to whether Santangelo was treated less favorably than similarly situated, younger employees and whether Crown Cork's reasoning for his firing was pretextual.

**A.    Less Favorable Treatment than Similarly Situated, Younger Employee**

Santangelo argues that Tutin treated him more harshly than younger Crown Cork employees. In order to show that, Santangelo must identify a younger employee who is "directly comparable . . . in all material respects." *David*, 846 F.3d at 226 (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014)). Factors to consider for this determination include "whether the similarly situated employee held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct." *Alexander*, 739

F.3d at 981.  In his opposition to summary judgment, Santangelo mentions younger plant managers Tim Carpenter, the 42 year-old Decatur plant manager, Doc. 61 at 7–8; Hank Mangum, the Spartanburg plant manager in his 40s, *id.* at 8; and Bret Shankelton, the Decatur plant manager who was in his "mid- to late 30s or early 40s," when hired in 2008, *id.* at 10.  But Santangelo identifies only Shankelton as a similarly situated comparator for purposes of his *prima facie* case.  Doc. 61 at 10.  Thus, the Court can disregard Carpenter and Mangum as comparators and turns to Shankelton.

Applying the factors determinative of whether Shankelton is an appropriate comparator, the Court finds that: Shankelton held the same position as Santangelo, plant manager; Tutin supervised and bore responsibility for Santangelo and Shankelton; Crown Cork's performance review policy and procedures governed both plant managers; and Tutin similarly placed Shankelton on a PIP.  Crown Cork argues that Shankelton was not similarly situated to Santangelo because Santangelo was much more experienced.  While Santangelo was a Crown Cork plant manager for ten years as compared to Shankelton's three years, Crown Cork ignores Shankelton's prior plant manager experience.  He was a plant manager for another company immediately before he began work at Crown Cork's Danville plant.  The Court finds that Shankelton is similarly situated to Santangelo and a sufficient comparator.  *See Alexander*, 739 F.3d at 981 (finding comparators "directly comparable" because they held same positions and assignments, worked under similar terms and discipline procedures, and had similar relevant conduct).  Santangelo must provide evidence that Shankelton "was accused of similar misconduct but was treated more leniently."  *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 907 (7th Cir. 2015).

Normally, because Santangelo was fired for poor performance, the Court should "ask" whether a younger, similarly situated plant manager "who [was] not performing up to expectations [was] also terminated." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 467 (7th Cir. 2014). The answer to that question is "yes." Crown Cork fired Shankelton in 2011 and then fired Santangelo in 2013. And both times, Tutin placed the plant manager on a PIP and then decided to fire him. Those facts are a strike against Santangelo's *prima facie* case under *McDonnell Douglas*.

But it is not useful to limit the Court's inquiry simply to whether the comparator was fired. *See, e.g.*, *Cottles v. Bank of Am., N.A.*, No. 06 C 2068, 2008 WL 905181, at *8 (N.D. Ill. Mar. 31, 2008) ("That Wozniak ultimately terminated Seraphin is no bar to her value as a comparator."). Santangelo claims that Tutin applied Crown Cork's performance review policy and procedures unfairly to Santangelo, "placing Santangelo under greater scrutiny than other, younger plant managers were subjected to." Doc. 61 at 1. Evidence supporting this claim would be enough to show differential treatment under the *McDonnell Douglas* test. *See Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 829 (7th Cir. 2012) (considering plaintiff-appellant's claim that "she was treated differently than other sales associates who were placed on performance-improvement plans"); *Cottles*, 2008 WL 905181, at *8 ("Cottles contends that [his comparator's] termination was not immediate like his, and that [his comparator] received step discipline and counseling for several of her violations whereas he was terminated immediately. Thus, Cottles can show that [his comparator] was treated more favorably than he was treated."). The Court, then, considers Santangelo's claim that the younger Shankelton received a more favorable experience after Tutin identified each plant manager's performance problems.

Santangelo alleges that Tutin critiqued and investigated Santangelo but not the younger Shankelton; (2) provided Shankelton, but not Santangelo, with guidance on how to address Tutin's concerns; and (3) allowed Shankelton more time to address Tutin's critiques than he allowed Santangelo.

### 1. More Scrutiny on Santangelo than Shankelton

Santangelo argues that a jury must decide whether Tutin wrongly scrutinized Santangelo but not Shankelton. But while Santangelo claims that Tutin and McGovern targeted Santangelo with plant visits, the facts belie his claim. Nor has he demonstrated that he has evidence Tutin placed any unnecessary scrutiny on Santangelo but not Shankelton.

Santangelo points out that Tutin and McGovern conducted an all-shift visit at Alsip, the first such visit by Tutin at Alsip. He also questions whether Tutin lied to Santangelo about the reason for the visit. The undisputed record indicates that Tutin conducted all-shift plant visits at Crown Cork's Faribault and Spartanburg plants, including asking every crew on every shift about the leadership at Spartanburg, before he did the same at Alsip. And although it might have been better to tell Santangelo the real reason for the all-shift visit, Santangelo does not explain why Tutin needed to tell Santangelo the true purpose of the Alsip visit or why it was unfair to hide it. Alone, there is no material dispute of fact here.

Santangelo also complains that Tutin and McGovern only asked negative questions about plant management during their all-shift visit. But he does not explain why that was unfair scrutiny as compared to what Shankelton faced. Further, before the all-shift visit, Tutin had concerns about plant management and McGovern had received complaints about management. It makes perfect sense for them to review whether there was a management problem. Santangelo's complaints here are not material either.

Finally, Santangelo argues that McGovern never conducted all-shift interviews at the Decatur plant when Tim Carpenter was the plant's manager despite complaints at that plant. But Santangelo needs evidence of more favorable treatment of Shankelton, his chosen comparator, not Carpenter.

### 2. More guidance for Shankelton than Santangelo

Santangelo argues that Tutin gave Shankelton better guidance than Santangelo on how each plant manager should navigate his performance issues. Santangelo does not provide the Court with operating manuals, company guidelines, or testimony confirming the expected practices and procedures for Tutin to correct a plant manager's problematic performance. Santangelo cites only to a training presentation on Crown Cork's "Employee Performance Roadmap" standards, dated November 2013. The presentation is not helpful to the Court's analysis of performance improvement standards at Crown Cork because the presentation (1) explains the importance of the "Employee Performance Roadmap," the title of Crown Cork's written annual performance review; (2) does not detail performance improvement standards or the process by which to accomplish performance improvement; and (3) is dated after both Shankelton and Santangelo had been fired. Santangelo presents no evidence that allows the Court to determine whether Tutin unfairly deviated from the performance improvement process in favor of Shankelton or against Santangelo.[9] Still, the Court addresses the differences that Santangelo highlights.

---

[9] The parties do not say what a PIP is or what it meant to be on a PIP at Crown Cork. Typically, "[u]nder a Performance Improvement Plan, an employee is given a plan for improvement and placed on a warning system." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 362 (7th Cir. 2009). An employee usually is fired if he does not follow or show improvement under the PIP. *See id.* But the parties did not present facts outlining Crown Cork's procedures for PIPs. Santangelo testified that Tutin failed to follow a progressive discipline system when he fired Santangelo, but Santangelo did not know if there was such a system, just that he had heard there was one from a former vice president of human resources.

Santangelo argues that Tutin's first memorandum to Santangelo threatened termination while Tutin's first memorandum to Shankelton did not. Crown Cork argues that Santangelo is comparing the wrong memoranda and that he is ignoring that Shankelton's PIP, like Santangelo's, did threaten termination. Tutin's March 1, 2010 memorandum to Shankelton did not threaten to terminate Shankelton. But Santangelo has no evidence to show that the March 1, 2010 memorandum to Shankelton was a PIP.[10] Shankelton's PIP on May 19, 2011 did threaten Shankelton with termination if he did not improve. Because a PIP is a warning system that usually results in termination if improvement is not made, *Patterson*, 589 F.3d at 362, the Court cannot compare Santangelo's PIP to anything but Shankelton's May 19, 2011 PIP. Therefore, Santangelo's dispute is immaterial.

Santangelo argues that Tutin and McGovern did not give Santangelo the information he needed to remedy plant complaints and that they rejected his attempts to address the fall-out from the all-shift visit, in comparison to Shankelton, whose earlier March 1, 2010 memorandum contained some employees' names. Santangelo's PIP contained anonymous Alsip employee complaints about management, and McGovern admitted that she did not write down names even though she normally would have. But this is not a material issue. Even though the complaints were anonymous, the complaints were detailed enough that Santangelo knew some of the complaints were about Speeks or Rayhill and not about Santangelo himself. Therefore, Santangelo was capable of discounting the complaints that he knew were not about him. Santangelo also argues that Tutin and McGovern stopped him from discovering which

---

[10] Tutin denied that the March 1, 2010 memo was a PIP: "No, this is not a performance improvement plan. . . . It's just simply me giving candid feedback[.]" Doc. 59-2 at 300:23–301:4 (Tutin Dep. Tr.); *see also id.* at 301:9–23 (explaining why the March 1, 2010 memo was not a PIP and repeatedly denying questions asking whether the memo was a PIP). And as discussed, Santangelo presents no evidence showing that the March 1, 2010 memorandum should be interpreted as a PIP because he presents no evidence identifying Crown Cork's standards for a PIP.

employees had issues with Santangelo because McGovern did not let Santangelo put his PIP into other employees' files. But McGovern wanted Santangelo to conduct one-on-one meetings with employees instead of passing the buck to his subordinates. Santangelo did not follow McGovern's advice for alternative investigation, so he cannot complain that Tutin and McGovern prevented him from determining which subordinates had complaints concerning him.

Santangelo also argues that Tutin's performance improvement communication to Shankelton was more robust than his communication to Santangelo. Even assuming that Tutin's memorandums to Shankelton contained more pages and details than those to Santangelo, Santangelo's only complaint is that Tutin named specific employees for Shankelton but not Santangelo. As discussed, this difference is immaterial.

Santangelo also claims that Tutin provided more feedback to Shankelton than Santangelo. It is undisputed that "Tutin provided [Santangelo] with feedback on his performance under the PIP via telephone conversations, email, written memos, and face to face meetings when at the Alsip plant." Doc. 59 ¶ 55. Tutin told McGovern and Bolton that he was doing this, including telling McGovern that he was having meetings "very often" with Santangelo. McGovern testified that PIPs usually required monthly meetings although she had no documentation of any guidance she gave Santangelo during his PIP.

Santangelo denies that Tutin met face-to-face with Santangelo until five months after the PIP, when Tutin gave Santangelo his annual performance review. Santangelo also says that Tutin did not respond to a change plan update until December. But this contradicts his agreed upon fact that "Tutin and McGovern met with [Santangelo] on September 18, 2012 to discuss [his] Change Plan Update of September 13, 2012, and the next day, Tutin sent [Santangelo a memo as a follow up to that meeting." Doc. 59 ¶ 45.

In contrast, Tutin wrote in his May 13, 2011 memorandum that before he placed Shankelton on a PIP, Tutin told Shankelton that Tutin had been "more accessible to him than to all of my other [plant managers] combined." Doc. 59-16 at 25 (Dep. Ex. 101). But it appears that Shankelton also had complaints about Tutin's availability. Tutin noted that Shankelton complained: "I do not talk to him enough. I ([Tutin]) do not answer his phone call or his E-mails, I come to his plant and I don't spend time with him until the exit interviews where I then unload on him." *Id.* Tutin noted that he replied to Shankelton, in part, that: "while this week may have been an exception, my previous visits could in no way be described in this manner and I have been more accessible to him than to all of my other [plant managers] combined!" *Id.*

There is a dispute of fact as to how much feedback and face-time Tutin gave Santangelo. The Court determines that this issue is not material. Even in the light most favorable to Santangelo, the evidence shows that Tutin was giving feedback to Santangelo and Shankelton alike. Tutin was meeting with Santangelo and Shankelton whenever he visited their plants. And, like Santangelo, Shankelton felt that Tutin was ignoring him. Finally, Santangelo has not demonstrated that the amount of feedback Shankelton received was preferential treatment, especially when the events happened a year apart.

### 3. More Time for Shankelton to Improve than Santangelo

Santangelo also argues that Tutin gave Shankelton more time to improve than Santangelo and, thus, Shankelton received a better performance-improvement opportunity than Santangelo. A reasonable juror could find that Tutin gave Shankelton fifteen months for improvement and remediation between Tutin's March 1, 2010 memorandum to Shankelton and Shankelton's firing on June 1, 2011 and that Tutin gave Santangelo as little as seven months between Santangelo's

July 2, 2012 PIP memorandum and February 15, 2013, when Tutin says he began considering whether to fire Santangelo.

The Court also recognizes, however, that, as Santangelo points out, Tutin wanted to fire Santangelo immediately after Santangelo tried to give his PIP memorandum to his management employees at Alsip. Tutin wanted to "accelerate the change in leadership" and "pull the trigger" at the end of July. Doc. 62-6 at 1. But despite finding Santangelo's response to the PIP memo "beyond outrageous," *id.*, Tutin did not fire Santangelo immediately. Instead, Tutin allowed Santangelo more time to improve his performance. In contrast, Tutin fired Shankelton two months after he placed him on a formal PIP.

The differences in treatment are minute and immaterial. Nonetheless, in the light most favorable to Santangelo, Tutin gave Santangelo half as much time and less information than Shankelton to correct his performance issues. Santangelo may have some evidence showing less favorable treatment than his similarly situated, younger comparator. *See Alexander*, 739 F.3d at 981 (favorable reassignments and laxer discipline, along with increased privileges and enabling handling, were proof of favorable treatment); *Dossiea*, 2008 WL 4133418, at *5 (finding that supervisor's varying disciplinary treatment of plaintiff and comparator was enough to establish *prima facie* case under *McDonnell Douglas*). Because of Santangelo's evidence and because the issues of comparator treatment are intertwined with other issues, the Court moves to the question of pretext.

### B. Pretext / Nondiscriminatory Reason

To show that Crown Cork's standards and critiques are pretextual, Santangelo needs evidence that Crown Cork and Tutin were "dishonest rather than simply foolish or unreasonable." *Schmitt v. Cent. Processing Corp.*, --- F. App'x ----, 2017 WL 1202022, at *4

(7th Cir. Jan. 12, 2017); *Pilditch v. Bd. of Educ. of City of Chicago*, 3 F.3d 1113, 1117 (7th Cir. 1993) ("[T]he plaintiff is left to unmask, if he can, the reasons proffered by the employer as fake."). He can "demonstrate pretext directly by showing that 'a discriminatory reason more likely motivated' his termination, or indirectly by showing that [Crown Cork's] explanations are 'unworthy of credence.'" *Senske*, 588 F.3d at 507 (citation omitted). "At the end of the day, the question is simply whether 'the same events would have transpired' if [Santangelo] 'had been younger than 40 and everything else had been the same.'" *Id.* (quoting *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994)); *Widmar*, 772 F.3d at 465. And Santangelo "must specifically rebut *each* nondiscriminatory reason [Crown Cork] has given." *Sisto v. NXP Semiconductors USA, Inc.*, No. 11 CV 7030, 2013 WL 870604, at *7 (N.D. Ill. Mar. 7, 2013) (citing *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403–04 (7th Cir. 2008)); *see also Russell v. Acme–Evans Co.*, 51 F.3d 64, 69–70 (7th Cir. 1995)). "Merely, showing that one of multiple reasons is pretextual" is insufficient. *Sisto*, 2013 WL 870604, at *7.

Crown Cork states that it fired Santangelo because of his poor performance as a plant manager, specifically identifying his problems with leadership, planning, organization, and implementing quality control at Alsip. Tutin identified those issues in Santangelo's PIP and then later cited them as the reasons he recommended that Crown Cork fire Santangelo. The Court finds that Santangelo has not demonstrated pretext for all of these reasons provided by Crown Cork.

The Court begins with Crown Cork's issue with quality control at Alsip. Santangelo's issues essentially began when Tutin emailed Santangelo in June 2012 to question Santangelo's use of temporary hourly workers to sort out defective cans held for inspection. Although the email was about a business decision—Tutin's disagreement with Santangelo's choice of

temporary over full-time workers—the underlying message in Tutin's June 2, 2012 email was that Tutin believed Santangelo was not doing enough to prevent HFIs. Then in August 2012, Alsip had another quality control issue that led to a customer accepting cans with suspect quality. The next year, in January and February 2013, there were more quality issues. Tutin wrote that the last event was caused by "poor management controls and processes." Doc. 59-6 at 1. It was after the last quality problem that Tutin decided that Santangelo was not improving.

Santangelo does not dispute that any of these quality events occurred. Instead Santangelo argues that Alsip's plant quality was fine under his leadership. He points out that he and the Alsip plant rebounded in late 2012 after his PIP began. He felt that he had fulfilled the action plan in his change plan updates by December 2012. McGovern told him things were getting better. Tutin told him he had made significant progress and praised his work towards improvement in his annual performance review. Some metrics placed Alsip at or near the top of rankings for cans held for inspection and efficiency variance. Alsip was the only plant to receive an award for best quality work in 2012. Tutin praised Alsip for its performance in 2013 in communications to the Aerosol Division and to Bolton.

Surely, Santangelo presents evidence that the Alsip plant was performing admirably. But Tutin still saw problems in Santangelo's leadership, quality control, and communication, demonstrated by the HFIs that continued to occur. Santangelo and Tutin had "a disagreement about the scope of [Santangelo's] job responsibility which [Crown Cork and Tutin are] entitled to define." *Widmar*, 772 F.3d 457, 466. The Court cannot determine whether it was "wise or fair to place the blame" on Santangelo's leadership for the quality issues that manifested as HFIs at Alsip. *Id.* The Court can only determine whether it was honest for Tutin and Crown Cork to place those types of leadership expectations on Santangelo. *Id.* Maybe Crown Cork should have

focused more on the quantitative metrics that Santangelo champions. But if Crown Cork and Tutin were so focused on Santangelo's HFIs and quality control issues that they ignored other metrics, that just means Crown Cork and its executives may be bad managers. Even if Santangelo's metrics are a better judge of quality, the Court cannot substitute its managerial opinions for Crown Cork's. *Id.* at 464 ("This court has repeatedly stated that it is not a super-personnel department that second-guesses employer policies that are facially legitimate. . . . A court cannot interfere because an employer's decision is unwise or unfair."). Santangelo has to show that Crown Cork's standards were pretext, and he has not done so, which means that he cannot meet his burden of showing all of the reasons for his termination are pretext. Nevertheless, the Court considers Santangelo's other arguments for pretext as well.

Santangelo focuses on Tutin. He tries to paint Tutin as a liar in order to argue that Tutin's reasons for recommending Santangelo's termination are also lies. But the comments that Santangelo picks out as potentially untrue were not material to the decision-making process to terminate Santangelo. Santangelo also argues that Tutin changed his mind on using temporary laborers to sort out defective products from held batches of product. But that is immaterial to the larger issue of preventing HFIs in the first place. And Santangelo argues that the August 2012 quality issue was not his fault. Fault or not, Tutin expected Santangelo to accept responsibility for quality problems and Santangelo fails to show why that expectation demonstrates pretext.

Santangelo also argues that his PIP falsely stated that "'several of the themes' coming out of the meeting had been 'discussed previously.'" Doc. 61 at 12 (quoting Doc. 59 ¶ 33). He swears in an affidavit that Tutin never before "expressed the concerns that were expressed in the memo." Doc. 62-4 ¶ 11. Of course, Santangelo's prior performance reviews did mention that Santangelo still needed to improve quality, leadership, plant communication, and accountability.

*See, e.g.*, Doc. 59 ¶¶ 7–9, 14, 18; Doc. 59-16 at 3–7; *id.* at 8–15; *id.* at 20–25; *id.* at 29–35. But even taking Santangelo's sworn statement as true—the Court will not make credibility determinations at the summary judgment stage—this is not enough to show that the reason for Santangelo's termination is pretext. Even if the PIP incorrectly stated that Tutin had raised issues with leadership, plant communication, and accountability before, this error does not mean that Tutin did not see problems in those areas when he decided that he needed to fire Santangelo.

Santangelo also latches onto similar hyperbole from Crown Cork's opening memorandum. Crown Cork uses phrases like "five years of futility," "old ways," and "perennial issues of poor leadership." Doc. 60 at 1–2. Santangelo argues that the Alsip plant was performing well, that he received positive comments in his annual performance reviews, and that, before he turned 60, he averaged a 3.47 on his KPI ratings between 2005 through 2011. Therefore, he argues he was not having the yearly leadership issues that Crown Cork claims he did.

Santangelo's argument, however, ignores the particular reasons Crown Cork gives for its decision to terminate him. Crown Cork stated that Santangelo "struggled with the functional dynamic of his staff, . . . was not an effective communicator with his people on the shop floor, [had] perennial issues with quality lapses of control in his plant, and [had] numerous people . . . express dissatisfaction with the working environment [Santangelo] created." Doc. 60 at 12. Pointing to prior reviews and snippets of his annual performance reviews is not enough to convince the Court that a dispute of fact exists about the veracity of Crown Cork's reasoning when that reasoning is grounded in specific facts agreed to by the parties.

Santangelo's annual performance reviews are also full of negative anecdotes about his leadership, failure to connect with the plant's floor workers, and the plant's employees'

impressions of the plant's work environment. His average scores say nothing about the specific concerns raised by Crown Cork. Further, Santangelo focuses on a time period before Tutin's quality concerns cropped up in 2012 and 2013. In fact, Santangelo's KPI scores fell after the HFI events; similarly, Tutin decreased Shankelton's KPI scores after Shankelton's problems began.

Further, when Santangelo presents evidence about his own performance that he deems favorable, it is not helpful to his cause. First, Santangelo highlights praise from two performance reviews written by another supervisor, not Tutin. And then Santangelo cherry-picks praise by ignoring concerns that cropped up again (1) in his PIP, (2) in Tutin's recommendation to fire him, and (3) Crown Cork's stated reasoning for his termination. For example, Santangelo argues that Tutin praised Santangelo "for having the 'right model for management in place in Alsip.'" Doc. 61 at 5.[11] But Santangelo omits relevant information from this quotation.[12] In Santangelo's annual performance review that Tutin dated January 25, 2008, Tutin wrote: "Neal has the right model for management in place in Alsip and it is unfortunate that the team failed to follow through and completely control key elements in the operation such as quality control and preventative maintenance and repair, both of which contributed to the claims issue in 2007." Doc. 59-13 at 7 (Dep. Ex. 5). This demonstrates that concerns about Santangelo's ability to lead

---

[11] Santangelo cites to numerous facts that appear to be undisputed—they come from the same documents that are relied on in the Joint Statement of Undisputed Facts—yet are not included in the Joint Statement of Undisputed Facts. *E.g.*, Doc. 61 at 4–6 (citing to a group exhibit and summary exhibit attached to opposition to summary judgment and citing to exhibits to the Joint Statement of Undisputed Facts).

[12] Additionally, Santangelo cites to an unclear source. *See* Doc. 61 at 4 (citing multiple documents and page ranges and then referencing later quotes with "ibid" and without reference to specific documents or page numbers). It is not the Court's job to go "hunting for truffles buried in [the record]." *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 702 (7th Cir. 2010) (alteration in original) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

Alsip stretched back to 2007 and does not undermine Tutin and Crown Cork's reasoning for terminating Santangelo for leadership and quality control problems.

To Santangelo, Tutin's standards and Crown Cork's reasons for termination might seem subjective. But even "relying on subjective factors is not per se illegal." *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427–28 (7th Cir. 1992). Subjective rationale for a termination does not equal pretext when there is no evidence that the reason is "disingenuous or inconsistently applied," when there is no evidence that other "objective criteria" should have been used that would have contradicted the decision, and when there is no evidence that the decision was arbitrary because not enough investigation was performed. *See Perfetti v. First Nat'l Bank of Chicago*, 950 F.2d 449, 457 (7th Cir. 1991). Santangelo fails to demonstrate evidence of pretext necessary to succeed under *McDonnell Douglas*.

### C.      Evidence of Discrimination

"A district court must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question whether 'a reasonable factfinder [could] conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge[.]'" *Zegarra v. John Crane, Inc.*, No. 15 C 1060, 2016 WL 6432587, at *7 (N.D. Ill. Oct. 31, 2016) (quoting Ortiz, 834 F.3d at 765); *see also Pilditch*, 3 F.3d at 1117 (noting that when the plaintiff moves past the *McDonnell Douglas prima facie* case, the formula essentially disappears and he "must also prove that the true reason for his firing was discriminatory"). The Court weighs whether his evidence would cause "a reasonable factfinder to determine" that his termination was attributable to his age. *Aberman v. Bd. of Educ. of City of Chicago*, No. 12-CV-10181, 2017 WL 1036487, at *10 (N.D. Ill. Mar. 17, 2017) (after addressing McDonnell Douglass test, cumulatively assessing "all the evidence" to determine if

the plaintiff could prove a case of age and disability discrimination at trial). "[A]ssessing cumulatively all the record evidence without the assistance of the *McDonnell Douglas* paradigm," *David*, 846 F.3d at 227, a reasonable jury could not conclude that Santangelo's termination was the result of his age.

Santangelo continuously hints that Crown Cork is liable for age discrimination because Tutin and Crown Cork knew or could surmise that Santangelo was 60 years old. But "mere knowledge of an employee's age . . . does not evince pretext or discrimination." *Lynch v. Alpharma, Inc.*, No. 05 C 3065, 2006 WL 1120510, at *8 (N.D. Ill. Apr. 27, 2006). Nor is it enough that his termination followed his 60th birthday. *Baier v. Rohr-Mont Motors, Inc.*, No. 12-CV-8234, 2014 WL 6434584, at *10 (N.D. Ill. Nov. 17, 2014) ("Plaintiff also cannot rely on suspicious timing to show age discrimination[.]"). And as discussed above, Santangelo does not show that Crown Cork's reasons for firing him were untrue or tainted with age animus.

Santangelo's evidence about other managers also is not convincing. Shankelton's treatment alone would not convince a jury that age discrimination occurred. It also is undisputed that Gann resigned, and there is no evidence about why Tutin fired McGrath. Santangelo questions why Tutin did not conduct an all-shift visit to Mangum's Spartanburg plan, but that alone is immaterial. Finally, Santangelo latches onto the case of Jim Zahn, who he claims was the last plant manager before him to turn 60 years old. But Santangelo ignores that Tutin did not supervise Zahn and that Zahn resigned after an investigation in which Tutin was not involved.

If a plant manager is fired after repeated quality issues at his plant, can the employee convince a jury that he was fired because of his age by only showing that (1) he was the oldest plant manager, (2) he did not get the best help possible to improve his performance after the quality issues started, and (3) he was working for a company and a supervisor who did not grade

him on the metrics he thought were most important?  The Court thinks the answer is no and that

a reasonable juror would agree.  Based on the Court's detailed review of all the briefing and

materials presented by the parties and considering the evidence as a whole in the light most

favorable to Santangelo, a reasonable jury could not find for Santangelo at trial.  The Court

grants summary judgment to Crown Cork on Santangelo's ADEA and IHRA claims.

## II.     Tortious Interference Claim Against Tutin

Santangelo also alleges that Tutin intentionally interfered with Santangelo's employment

relationship with Crown Cork.  To prove his tortious interference claim, Santangelo must show:

(1) a reasonable expectation of entering a valid business relationship, (2) Tutin's knowledge of

that expectation, (3) Tutin's purposeful interference that prevented Santangelo's legitimate

expectation from becoming a valid business relationship, and (4) damages resulting from Tutin's

interference.  *Atanus v. Am. Airlines, Inc.*, 932 N.E.2d 1044, 1048, 403 Ill. App. 3d 549, 342 Ill.

Dec. 583 (2010).  "Illinois law has recognized a privilege for corporate officers and directors to

use their business judgment and discretion on behalf of their corporations," which "applies to

situations involving a corporate officer's interference with the corporation's contractual

relationship between the corporation and an employee." *Croft v. Inlight Risk Mgmt., Inc.*, No. 01

C 1766, 2002 WL 31010830, at *7 (N.D. Ill. Sept. 9, 2002) (quoting *Chapman v. Crown Glass

Corp.*, 557 N.E.2d 256, 263, 197 Ill. App. 3d 995, 145 Ill. Dec. 486 (1990)).  "This privilege is

destroyed only if the alleged interference by the corporate officer or director is done 'solely for

the person's own gain or is solely for the purpose of harming the plaintiff.'"  *Id.* (quoting

*Chapman*, 557 N.E.2d at 263).  A corporate employee also can be held liable for interfering with

his employer's business relationship with another employee if the employee "places his or her

own interests ahead of the corporate entity's interests."  *Marcial v. Rush Univ. Med. Ctr.*, No.

16-CV-6109, 2017 WL 2180503, at *6 (N.D. Ill. May 18, 2017); *see also Trujillo v. Am. Bar Ass'n*, No. 13 CV 8541, 2015 WL 5139419, at *7 (N.D. Ill. Aug. 28, 2015).

Tutin argues that Santangelo cannot prove that Tutin placed his own interests before Crown Cork's interests in continuing to employ Santangelo. Santangelo responds that a jury could determine Tutin had an age-based animosity and this motivated Tutin to ignore Santangelo's good work and recommend that Crown Cork fire Santangelo. For once, the parties agree: Santangelo's tortious interference claim against Tutin rises and falls with his age discrimination claims against Crown Cork. As discussed above, Santangelo has not shown that Tutin's decision was motivated by Santangelo's age. Tutin emphasized that Santangelo had to take ownership of all deficiencies as plant manager. Tutin believed that the buck stopped with the plant manager, and Santangelo knew that was how Tutin judged his managers. Tutin identified Shankelton as having the same general plant manager problems for which Tutin focused on Santangelo; both plant managers' KPI scores fell below 3.00 before they were fired. Ultimately, neither plant manager, young or old, could please Tutin. Santangelo has no meaningful evidence that Tutin's plant manager-measuring stick skewed against Santangelo because of his age. Tutin is entitled to summary judgment as well.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [58]. The Court enters judgment for Crown Cork and Tutin. This case is terminated.

Dated: June 5, 2017

SARA L. ELLIS
United States District Judge